IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

EUGENE G. JAEGER,                    :

    Plaintiff                       :    CIVIL NO.:

    vs.                             :    15-CV-02632 RDB

INTERNATIONAL RENAISSANCE           :
FESTIVALS, LTD., dba MARYLAND
RENAISSANCE FESTIVAL,
    Defendant.                       :    August 23, 2016

- - - - - - - - - - - - - - - - - -

The deposition of EUGENE GEORGE JAEGER, taken on Tuesday, August 23, 2016, commencing at 9:56 a.m., at 100 South Charles Street, Suite 1401, Baltimore, Maryland 21201, before Shannon M. Wright, a Notary Public.

- - - - - - - - - - - - - - - - - -

Reported by:
Shannon M. Wright

**EXHIBIT 1**

APPEARANCES:

  On behalf of Plaintiff

        JOHN P. COLE, ESQUIRE
        The Law Office of John P. Cole, LLC
        401 Cherry Street, Suite 610
        P.O. Box 1801
        Macon, Georgia 31202
        Ph (478) 238-4716
        johnpcole01@bellsouth.net


On behalf of Defendant

        JONATHAN D. NELSON, ESQUIRE
        Ferguson, Schetelich & Ballew, P.A.
        100 South Charles Street, Suite 1401
        Baltimore, Maryland 21201
        Ph (410) 837-2200
        jnelson@fsb-law.com

recall?

A    Well, let's see.  I ended up with about six years of schooling, but not enough accumulation to graduate.  So I think I left there in about late '60s.

Q    What did you study while you were there?

A    I studied design.  I studied everything, but ended up in design.

Q    Gotcha.

And I know, currently, you run your own business; is that -- is that right?

A    Right.

Q    And that's Unicorn Strings Music Company?

A    Right.

Q    How long have you been doing that?

A    Since '80.  1980.

Q    And we don't need to go into great detail, but between the time you left SIU and the time you started Unicorn Strings, give me an

overview of what you did professionally in that time.

A   Professionally, this was the '60s, so I started a -- was part of a group that started a commune.  After that, I learned how to be a carpenter and did that for a while.  Traveled in Europe.  So, professionally, really not very much.

Q   Tell me about the Unicorn Strings business.  What -- what -- what do you do?

A   Well, I -- it's -- it's a sub S corporation, so I'm the president, but I do everything.  I mean, I design the pieces, and the production and the sales, and I -- now I'm the only employee and I do all the work.  I make them, clean up, and ship them.

Q   And what kind of business is Unicorn Strings?

A   It makes musical instruments out of wood.

Q   Any particular kinds?

A    It's an instrument called a bowed psaltery.  It's a medieval instrument.  That's why I was -- I go to Renaissance festivals.  Or I have.  Excuse me.  And it's -- it's a medieval instrument.  It's pretty obscure.

Have you ever -- do you play an instrument?  Can I ask you questions?

MR. COLE:  You can't.

A    All right.  Sorry.

Q    We can talk off the record about my musical skills, or lack thereof.

But -- and so you make and produce and sell bowed --

A    Bowed psaltery.  It's a --

Q    Would you spell it for me?

A    B-O-W-E-D.  It's played with a bow.  P-S-A-L-T-E-R-Y.

Q    And that's -- that's the main or only instrument you create?

A    It's the only instrument, and I have accessories for that.  Stands and cases and

music books and tuners and stuff like that.

Accessories.

Q    In addition to Renaissance festivals, do you sell the bow psaltery elsewhere?

A    Well, I have a website.  I get phone orders from shows that I've done in the past.  I go to music festivals and art shows.

Q    Are you able to sort of break down from where you get your most business to least business?

A    Over the years, it's changed.  It was heavily Renaissance festivals for a long stretch.  Then it was art shows mostly in Florida, but in the east.  And then it narrowed down to just a few art shows, the better ones in Florida.  And now it's strictly phone orders and internet.

Q    And you said that you are the only employee currently?

A    Right.

Q    Have you had other employees in the

CRC Salomon, Inc.
Office (410) 821-4888
www.crcsalomon.com - info@crcsalomon.com
2201 Old Court Road, Baltimore, MD 21208
Page: 12
Facsimile (410) 821-4889

Q    Do you know how long she's been doing that?

A    Almost ten years.

Q    Is your -- do you have health insurance?

A    Yes.   Through the library.

Q    And your wife's employment?

A    Yes.

Q    Tell me about your relationship with the -- what I'll call the Maryland Renaissance Festival.

A    What do you mean by relationship?

Q    How long or during what period of time did you act as a vendor at the festival?

A    It was about ten years, and it ended in -- hmm, I think it was two years ago.  I'd have to look it up, but I'm pretty sure it was -- well, this would be the -- maybe the second one that I missed.  Maybe the third.

Q    So is it fair to say that you participated as a vendor in the festival from

approximately 2003, 2004 to 2013, 2014?

A    Approximately, yes.

Q    And where was the festival held?

A    It was held in Crownsville, Maryland.

Q    And during your participation at the festival, was it held at the same location throughout those approximately ten years, or did the locations change?

A    No, it didn't change.  It's a permanent setting.

Q    And for what period -- how often is the festival?

A    Well, it's an annual festival, and it's eight weeks usually starting some -- and it's on the weekends only, and holidays.  Late August to early October, I think it would be.  It varies, because they start it on a -- I think they start it the week before Labor Day.  I'm not sure.  That's what triggers it.  And then it goes for eight weeks.  It may be nine weeks.  I'd have to look that up.

CRC Salomon, Inc.
Office (410) 821-4888

www.crcsalomon.com - info@crcsalomon.com
2201 Old Court Road, Baltimore, MD 21208

Page: 24
Facsimile (410) 821-4889

Deposition of Eugene G. Jaeger          Eugene G. Jaeger v. International Renaissance Festivals, LTD., dba Maryland Rena

Q    And -- and during that approximate ten-year period where you participated, were you -- when I say constant participate, were you there each those --

A    Yes.

Q    -- ten years?

How did you first get involved with the Maryland Renaissance Festival?

A    I was a guest artist one year, and I was invited back that same fall maybe two other times.  At least one other time.  And then I applied for permanent status and was accepted. So then the following fall, I was given a booth to display in and offered the opportunity to buy the booth.

Q    How did you become a guest artist?

A    It's an application process, and I had a salesperson that had worked for me at other shows encourage me to apply, and I applied and was accepted.

Q    Is becoming a guest artist a

accolades and the sales go down.

Q   I imagine there's only so many bowed psaltery that one can have?

A   People make a point to come up and say, I love my bowed psaltery.  And I see them all day.  Instead of, Oh, these are great, let's get one.  So I see the writing on the wall.

Q   The -- the booth that you occupied as a vendor during your period at the Maryland Renaissance Festival, was that the same booth throughout your tenure there?

A   Yes.

Q   If you could, would you mind drawing just, I guess, a general sketch of what the area around your booth looked like?  You know, your booth, anyone next to you, that -- that type of thing just to give me a sense of the area looked like.

A   Do you want a schematic form or a sketch?

Q   What's the difference?

(Whereupon, Jaeger Deposition Exhibit No. 1, marked.)

Q    Mr. Jaeger, I'm going to hand you this blue pen.  Would you -- you made some descriptions about different booths and areas.

Would you mind labeling them with me with the blue pen?

A    Okay.

Q    And let's -- I'm not sure how much turnover there was, but let's focus on 2012 to the best of your recollection.

A    Okay.

Q    You finished?

A    Yes.

Q    Okay.  And I believe you described before this rectangle at the bottom of the page as a boardwalk.  Am I correct?

A    Yes.

Q    Is that the boardwalk where you fell?

A    Yes.  I -- yes, exactly.

Q    Would you just mark that as the

boardwalk, or label it for me, please?

    A    Yeah.   I don't need to draw in the rest of the boards, do I?

    Q    That's fine.

    A    Okay.

    Q    And you said the area in between is -- is a gravel -- how did you describe it?   A gravel --

    A    A gravel walkway.   It varies in width. It's -- it's the -- it's the -- it's an area between the boardwalk and the booth.   And that's where the crowd flows.   They pretty much flow this way, and they stand around on the boardwalk.   Both ways.

    Q    Would you mark that for me, too, please?   Just gravel walkway or whatever you think is appropriate.

    A    Okay.   Okay.

    Q    And can you describe this area for me, I guess, from a topographical or nature standpoint?   Is it hilly?   Is it flat?   Are

there trees?  What does it look like?

A   Well, okay.  Let me add something here.
The boardwalk is at the bottom of a hill.  The
hill goes up this way.  And this is a -- kind of
a marshy area.  Maybe over here starts another
set of hills.  At the bottom is a creek.  So
this low, marshy area is below the boardwalk,
under the boardwalk, and past the boardwalk.  So
the boardwalk sort of stops the downhill
progression.  And it has a rail along here.
So -- so this is uphill.

Q   Are the -- are the booths actually on a
slanted hill?  I mean --

A   Yes.

Q   -- how steep is the gradient, would you
say?

A   Well, I'll -- how shall I describe
that?  I mean, like that?

Q   I would say in words to the best of
your ability, understanding that I -- I am
assuming you didn't take any specific

measurements.

A    Okay.  It's sort of -- it's pretty flat where the gravel is; although, it's sort of humped a little bit.  It's just slightly downhill from this area to there.  And then it's -- it's a little bit steeper where the booths are, and then it's even steeper behind the booths.  Definitely downhill from back up here to probably right about there.

Q    What's located behind the booths, if anything?

A    Woods.  Sort of a weedy, woody area. Trees, natural trees.  I think they were originally there.  The whole site is -- was woods, I guess, and they cleared it for the booths.  So it is what was originally there and forest.

Q    What's the distance between the -- I'll say the back of the booths and where the woods begin?

A    The woods come right up to the booth.

And the woods -- this is a large tree.  Well, let's see.  Let's see.  I forget where that tree is.  Let me just say that it's -- the location is in question.  There is or was a large tree like maybe here.  Somewhere there.  Some trees have been removed.  And then there's another large tree here, but these are large trees.  So the woods actually come down to the boardwalk, I think, technically.

Q    And what's -- I know you talked about it a little bit, but what's below the boardwalk?

A    Kind of an area that looks like it probably floods when -- in a heavy rain.  Creek.  There's a little creek.  At night, there are scurrying animals down there.

Q    Does -- what's the distance between the low end of the -- when I say low, as oriented on this Exhibit 1, what's the distance between the -- the low end of the boardwalk and the creek?

A    Well, the creek meanders, and it's not

CRC Salomon, Inc.
Office (410) 821-4888
www.crcsalomon.com - info@crcsalomon.com
2201 Old Court Road, Baltimore, MD 21208
Page: 41
Facsimile (410) 821-4889

entertainers, they go there to entertain, but the vendors go there to vend.  So that was -- I mean, I never said, Can I sell my instruments? It's just -- maybe you could rephrase it and I could --

Q    Sure.

A    -- be more concise.

Q    Sure.  And when I say was there anything else, I wanted to make sure I wasn't limiting your answer through my question.

A    Oh.  No.  I mean, I was there to sell my instruments and get out of there.

Q    Fair enough.

All right.  Let's, I guess, focus in a little bit on the day the -- the incident.  And when I say incident, do you understand what I mean?

A    Yes.

Q    That's the date where you fell.

A    That's why we're here.

Q    Exactly.

CRC Salomon, Inc.
Office (410) 821-4888
www.crcsalomon.com - info@crcsalomon.com
2201 Old Court Road, Baltimore, MD 21208
Page: 67
Facsimile (410) 821-4889

Can we agree that it was September 9, 2012?

A    Is that -- is that the date?   It was on a Sunday?

Q    Yes.   I'll represent to you it was --

A    Okay.

Q    -- September 9, 2012.

A    Yes.   Then I agree.

Q    All right.   And that's the date in your complaint and --

A    It was a Sunday, yes.

Q    I'm sure counsel would raise an objection if there was an issue.

A    Right.

Q    And -- and it's your recollection that that was a Sunday?

A    Yes.

Q    Do you recall how long in terms of -- whether you want to say days or weeks, how long the festival had been going on in 2012?

A    I'm pretty sure this was the second

opened at 10 a.m. like normal for the festival, right?

A    Yes.

Q    And you don't recall any particular issues or incidents?

A    Right, no.

Q    Once -- once you opened up on -- at 10 a.m. on September 9th, walk me through your morning.

A    Well, okay.  So the cannon goes off at ten.  It takes people a while to get to our booth because we're on the opposite side of the fair from the entrance.  So somewhere between 10:15 and 10:20, people start showing up.

Meanwhile, between ten and 10:20, people usually -- the artists would talk to each other.  Sometimes they would leave their booth and go into another person's booth.  And he would stand out there and sort of wait for somebody to walk by so that we would start playing.  His job mainly was to demonstrate the

sound of the instrument as people walked by and then engage with them and answer questions. I would usually be behind the booth sort of maybe arranging the -- behind the tables arranging the office, the receipts, and the change box. And make sure the bows were clean. And we would do -- on a typical day, we would do those kind of things waiting for the crowds. People -- some people would come straight from the gate to our booth for a specific reason. And some time between -- some time around 11:00, we expected the crowd to be heavier. Heavy enough to keep us both busy talking to people. So it's casual. And with individuals in small groups filtering by until around 11.

At some point, I would go to the privies and get ready for the workday, and that's what I did on that day. So I went to the privies about 10:30 -- between 10:30 and 10:40. I walked to the far privies and walked back.

Q    So you would go prepare for the workday

A     Probably not more than five minutes.

Q     What did you do when you left?

A     I came out from that area, turned left and walked towards my booth.

Q     When you were walking back towards your booth from the privies, were you walking on the gravel walkway or the boardwalk?

A     I was walking on the boardwalk.

Q     And describe for me what happened as you were walking back to your booth.

A     As I neared my booth, I started to leave the boardwalk to go in an arc towards my booth.  And the first thing that I knew was one of my feet shot out from under me, straight out. And, trying to catch myself, the other one did, too, almost in the same instant.  And so both my feet were out straight in front of me, and I sat straight down hard.  Put my hands down like that.  And one second I was walking towards my booth, and the next split second I was flat on my butt on the ground.

A    Yes.    I don't remember any leaves, and I remember the boardwalk being clean and dry.

Q    Why do you believe that you fell on September 9, 2012?

A    I believe I fell because I stepped onto a patch of something very slippery.

Q    Do you know what that very slippery patch was?

A    Well, not specifically, but it was some kind of mud.    I know that.    And it seemed to have a consistency of clay and be the color of just some dirt.

Q    Well, how do you know that?

A    How do I know the consistency?

Q    Well, yeah.    And -- and you just said you don't really know what it is, but --

A    I don't know what it was, but I know how it felt.

Q    What do you mean?

A    It felt slippery.    Oh.

Q    I'm sorry.

around while I had caught myself with my hands. So they had hit the ground with whatever was there.

And, like I said, my concern was the injuries and not the dirt. I had a slight twinge of concern for the costume because it wasn't wearable after that, but then I quickly realized I didn't really need a costume now anyway.

So that's why I was muddy.

Q    I understand.

And -- and I guess I'm -- what I don't understand is you say you slipped. Understood.

And that you believe it was on a clay or mud substance because you had clay or mud on other parts of your body when you fell?

A    On the seat of my pants.

Q    But you fell straight down? Is that what you testified?

A    Yes.

Q    And when you walked originally from

your booth to the privies and you're walking along the boardwalk, did you make any observations about the condition of the boardwalk at that time?

A    I remember the boardwalk being beautiful, clear.  Not dangerous or suspicious at all.  I had seen it slippery.  It was not slippery.  It was clean.

Q    And then when you were walking back from the privies to your booth up until the time you fell, what, if any, observations did you make about the boardwalk -- the condition of the boardwalk?

A    The observations would have been peripheral, but I -- there was no problem with the boardwalk.

Q    So your testimony is that you observed no problem with the boardwalk either going to the privies from your booth or returning to your booth from the privies, but in the area where you slipped, there was sufficient mud or clay to

not only cause you to slip, but to get all over your clothing?

A    I wouldn't say that it got all over my clothing.  I would say that it got where I sat in it and some on my hands.  And it was not profuse.  There was some on my hands.  If there was any on the front of my costume, it would have been from my hands.  So it wasn't all over, but it was a good cake on the back.

Q    You also testified that you saw people slip and fall on the boardwalk, I believe you said, between three and six times a year; is that correct?

A    Yes.

Q    How come then as you were negotiating the boardwalk making your way back from the privies to the -- the -- your -- your booth avoiding pedestrians that you didn't pay attention to any potential obstacles on the boardwalk knowing that people often and slipped and fell on it?

Deposition of Eugene G. Jaeger          Eugene G. Jaeger v. International Renaissance Festivals, LTD., dba Maryland Rena

A    I wouldn't say that I saw any obstacles.  And I was familiar with the boardwalk, and, when it was slick, I didn't walk on it.  And when it was, I did -- when it was dependable, I could walk on it.  So that day, it was fine, and the whole boardwalk was dependable to walk on and -- except for that one spot.  And the spot was innocuous in that it seemed like just a dirty spot.

Q    How would you determine if the boardwalk was not slick enough -- well, I'm going to ask that in a bad way.

How would you determine if the boardwalk was dry enough to walk on or too slick to walk on?

A    Well, if it was wet, it was going to be slick.  I wouldn't walk on it.  If it was dry, it was good.  Depending on the conditions of the day, the morning, it could be wet because of rain or because of dew, and -- or wet leaves.  And if it was easier to walk on the gravel, I

Deposition of Eugene G. Jaeger                    Eugene G. Jaeger v. International Renaissance Festivals, LTD., dba Maryland Rena

walked on the gravel.  You could tell right away when you stepped on it if it was slick, and I'd seen enough people fall that I wouldn't walk on it -- excuse me -- if it was slick.  But that day, it was one of the days that it was dependable.  I have to say it was usually dependable.  When it was slick, people fell. And when it wasn't slick, they didn't.

Q    But on -- on that day, you believed it was dependable?

A    Yes.

Q    And the spot where you fell, I believe you described it as innocuous?

A    Yes.  It was camouflaged as just a dirty board -- set of boards, dirty area on the boardwalk.  And -- but as soon as I hit it, it zoop (phonetic).

MR. NELSON:  Did you get zoop?

(Whereupon, discussion was held off the record.)

Q    After you fell, do you recall going

Deposition of Eugene G. Jaeger   Eugene G. Jaeger v. International Renaissance Festivals, LTD., dba Maryland Rena

maintenance of the walkway was their responsibility.  In that responsibility would be proper repair and maintenance, whatever that would involve.  And I think that they allowed at least that accumulation, and no one did anything about it.

Q   And -- and just so we're clear, that accumulation is the area that you believe you slipped on?

A   Yes.

Q   Do you know when that accumulation accumulated?

A   No.

Q   Do you know if Maryland Renaissance Festival was aware that that accumulation had accumulated?

A   I -- I don't know if they would know or not.

MR. NELSON:   Can you mark this one, please?

(Whereupon, Jaeger Deposition Exhibit

No. 5, marked.)

Q   Mr. Jaeger, in front of you is what's been marked as Exhibit 5.  First page is sort of a memo.  Take a look -- take a look at Exhibit 5 for me and tell me if you know what it is.

A   As far as I can tell, it's the contract for 2012.  Craft Vendor Lease Agreement.

Q   And if you would, would you turn to the last page.  It's got a 5 on the bottom.

Do you see that?

A   Yes.

Q   On the left, there's a signature.

Do you see that?

A   Yes.

Q   Whose signature is that?

A   Mine.

Q   And above it, it has a date, correct?

A   Yes.

Q   And it says 22nd day of December 2011?

A   Yes.

Q   Do you recall signing this document?

A    Well, it's my signature.

Q    Okay.

A    And it -- the date says December 22nd. I was probably pretty busy with Christmas orders. And I signed a contract agreement every year, so I would say probably yes.

Q    So that's -- that's -- that is your signature?

A    Yes.

Q    And you have no reason to believe that you didn't willingly and voluntarily sign this document?

A    Would you -- would you say that again?

Q    Sure.

You have no reason to believe -- that's a bit of a doubling negative. I apologize.

But you have no reason to believe that you -- to the best of your recollection, you voluntarily signed this document?

A    Yes.

Q    And you have no reason to believe

otherwise?

A    Right.

Q    See, I get there eventually.

MR. NELSON:   Can we go off the record for one second?

(Whereupon, discussion was held off the record.)

MR. NELSON:   All right.   We can go back on.

Q    Mr. Jaeger, has -- in your discussion with your doctors, have they indicated any limitations on your physical capacity following your injuries?

A    No.

Q    Other than the, I guess, discussion you had with the -- was it the Half Moon Outfitters folks?

A    Mm-hmm.

Q    They're the husband and wife that helped you up --

A    Yes.

CRC Salomon, Inc.
Office (410) 821-4888
www.crcsalomon.com - info@crcsalomon.com
2201 Old Court Road, Baltimore, MD 21208
Page: 149
Facsimile (410) 821-4889