# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

EUGENE G. JAEGER,                    :

  Plaintiff                         :   CIVIL NO.:

 vs.                                :   15-CV-02632 RDB

INTERNATIONAL RENAISSANCE     :
FESTIVALS, LTD., dba MARYLAND
RENAISSANCE FESTIVAL,
   Defendant.                       :   August 23, 2016


------------------

        The deposition of EUGENE GEORGE JAEGER,

taken on Tuesday, August 23, 2016, commencing at

9:56 a.m., at 100 South Charles Street, Suite

1401, Baltimore, Maryland 21201, before Shannon M.

Wright, a Notary Public.


------------------


Reported by:
  Shannon M. Wright

period -- during that whole period of time, or would you come and go?  How would that work?

A    It varied over the years.  When I first started, I pulled a camping trailer and put it in a campground, and so I would stay there.

In the last either three or four years, I stayed in the back of the booth.  I remodeled it so there was a sleeping area, a little microwave, and a refrigerator, makeshift camping kitchen area, and so I would stay there.

Q    Do you recall what you were doing in 2012 in terms of your accommodations?

A    I was staying in the booth.

Q    And when the festival would end for a given weekend during its run, it would typically be 7 p.m. on a Sunday; is that right?

A    Yes.

Q    What would you do for the week between the -- the Sunday where it ends and then the following Saturday where it began again?

A    Most weeks, I would drive my car to the

different booths.

Do you see that?

A   Yes.

Q   Do you know which number your booth would be, or the vicinity of where it would be?

A   It's 842.

Q   All right.  Gotcha.

A   And you can see actually that space between the booths.

Q   Between 842 and 840?

A   Yes.

Q   I'm sorry.  I cut you off, but go ahead.  You were describing --

A   Well, you asked why I would go that way, and I was saying that I had a pass to one of the privies up there, so I would sneak out there and run up there.  It was uphill, but it was quick.  And then -- that was in early years.  And then I discovered that there were other privies at the end of this row, at the other end of the row that my booth is on.  And so after

boardwalk, wood boardwalk area, prior to September 9th -- September 9, had you ever seen anyone trip or fall in that area, in that walkway in the vicinity of your booth?

A    Many times.

Q    Can you estimate how many?

A    You know, let me back up a little bit. You said trip and fall.  I don't think they tripped.  I think they slipped.

Estimate how many?

Q    Sure.

A    You know, I would be working typically and engaged with customers, so I wasn't watching, but I would notice at least -- well, between three and six times a year depending on conditions.  If the boardwalk was dry, it was fine.  If it was wet, people would fall.

Q    Okay.  And so when -- and so I'm clear, when we're talking about people slipping and falling, we're talking about the boardwalk now, the wood area?

A    Yes.

Q    Okay.  And you said -- understanding it's an estimate, you said approximately three to six times a year?

A    Yes.

Q    Why do you believe they were slipping and falling?

A    If the boardwalk was wet and there were leaves on it, it was slick.  If it had been wet for a long time, it was slick.  So -- and they didn't know it.

Q    They being?  I'm sorry.

A    The customers.  So they would -- there would be an accident.  But, all of a sudden, we'd hear, Whoa.  The crowd would make a noise, and you would look over, and somebody was either splatted out or hopping up.

Q    And you said you believe that the cause of this was the wetness of the boardwalk and the presence of leaves?

A    Yes.  I'm not sure exactly how it

like I described earlier, some people would just hop up and act embarrassed, and some people would sit there for a while and have a hard time getting up.  I assumed that they were in pain.

Q   Do you know if any of the other vendors ever raised concerns about people slipping and falling on the boardwalk?

A   Well, what do you mean by raised concerns?

Q   Fair enough.

Mention the fact that people slipped and fell on the boardwalk to people involved with the Maryland Renaissance Festival.

A   The only person that I know was the person two booths down in the -- what I called Half Moon Outfitters.  And it's a person -- I don't know his real name, but his stage name or his festival name was Fuzzy, because he had a beard.  And he said -- he made the statement, I've been complaining to the festival for years about this.  That's all I know.  Whether he did

sound of the instrument as people walked by and then engage with them and answer questions.  I would usually be behind the booth sort of maybe arranging the -- behind the tables arranging the office, the receipts, and the change box.  And make sure the bows were clean.  And we would do -- on a typical day, we would do those kind of things waiting for the crowds.  People -- some people would come straight from the gate to our booth for a specific reason.  And some time between -- some time around 11:00, we expected the crowd to be heavier.  Heavy enough to keep us both busy talking to people.  So it's casual. And with individuals in small groups filtering by until around 11.

         At some point, I would go to the privies and get ready for the workday, and that's what I did on that day.  So I went to the privies about 10:30 -- between 10:30 and 10:40. I walked to the far privies and walked back.

    Q    So you would go prepare for the workday

A    Probably not more than five minutes.

Q    What did you do when you left?

A    I came out from that area, turned left and walked towards my booth.

Q    When you were walking back towards your booth from the privies, were you walking on the gravel walkway or the boardwalk?

A    I was walking on the boardwalk.

Q    And describe for me what happened as you were walking back to your booth.

A    As I neared my booth, I started to leave the boardwalk to go in an arc towards my booth.  And the first thing that I knew was one of my feet shot out from under me, straight out. And, trying to catch myself, the other one did, too, almost in the same instant.  And so both my feet were out straight in front of me, and I sat straight down hard.  Put my hands down like that.  And one second I was walking towards my booth, and the next split second I was flat on my butt on the ground.

Q    What time did you wake up on the 9th?

A    I usually woke up about seven, so it was probably that.

Q    And you said that you recalled it raining overnight?

A    Yeah.  Sprinkled.  I sleep with earplugs, so I can't really know.  It doesn't -- sometimes it registers, and sometimes it doesn't.

Q    What about on the 8th, the Saturday, September 8th, 2012, do you recall what the weather was like on that day?

A    Hmm.  No.  No, I don't.

MR. NELSON:  Please.

(Whereupon, Jaeger Deposition Exhibit No. 3, marked.)

Q    Mr. Jaeger, I'm showing you what's been marked as Exhibit 3.

Do you know what this is?

A    Yes.

Q    Can you describe it for me, please?

you make a circle around the area where you

believe you fell for me, please?

    A   Yes.  Now -- okay.  Exactly where in

this circle I'm not sure, but the bench that is

above the circle is probably the bench that they

took me to sit on.  And it's not stationary.

It's movable, so -- so that's as close as I can

pinpoint it.

    Q   And is that the bench that appears to

be to the right of your car in this picture?

    A   Yes.

    The bench was probably -- if I could

add something.

    Q   Sure.

    A   The bench was probably there, because

there -- a hole had appeared between the

boardwalk and the hill, and they put the bench

over it.  So I think that's -- and the hole

didn't move.  It was kind of a drainage hole.

So that's probably exactly where the bench was.

So in that circle is somewhere where the patch

of mud was, but I'm not exactly sure where.

Q    You say they put the bench there. Who's they?

A    I don't know.  I assume the grounds people.  Someone responsible for the grounds.

Q    Associated with the festival?

A    Yes.

Q    Do you know when the bench was put there?

A    No.  It wasn't put there in my presence.  So there were benches -- I don't know the exact locations.  I think they were gathered up and redistributed periodically.  So there was a bench there, and -- I didn't really pay attention to the -- to the locations of the benches, but that one appeared over the hole, and it stayed there.

Q    Do you recall when you first noticed a hole being there?

A    No.  No.

Q    This picture that's Exhibit 3, do you

A    Yes.  I don't remember any leaves, and I remember the boardwalk being clean and dry.

Q    Why do you believe that you fell on September 9, 2012?

A    I believe I fell because I stepped onto a patch of something very slippery.

Q    Do you know what that very slippery patch was?

A    Well, not specifically, but it was some kind of mud.  I know that.  And it seemed to have a consistency of clay and be the color of just some dirt.

Q    Well, how do you know that?

A    How do I know the consistency?

Q    Well, yeah.  And -- and you just said you don't really know what it is, but --

A    I don't know what it was, but I know how it felt.

Q    What do you mean?

A    It felt slippery.  Oh.

Q    I'm sorry.

A   I wouldn't say that I saw any obstacles.  And I was familiar with the boardwalk, and, when it was slick, I didn't walk on it.  And when it was, I did -- when it was dependable, I could walk on it.  So that day, it was fine, and the whole boardwalk was dependable to walk on and -- except for that one spot.  And the spot was innocuous in that it seemed like just a dirty spot.

Q   How would you determine if the boardwalk was not slick enough -- well, I'm going to ask that in a bad way.

How would you determine if the boardwalk was dry enough to walk on or too slick to walk on?

A   Well, if it was wet, it was going to be slick.  I wouldn't walk on it.  If it was dry, it was good.  Depending on the conditions of the day, the morning, it could be wet because of rain or because of dew, and -- or wet leaves. And if it was easier to walk on the gravel, I

Deposition of Eugene G. Jaeger    Eugene G. Jaeger v. International Renaissance Festivals, LTD., dba Maryland Rena

walked on the gravel.  You could tell right away when you stepped on it if it was slick, and I'd seen enough people fall that I wouldn't walk on it -- excuse me -- if it was slick.  But that day, it was one of the days that it was dependable.  I have to say it was usually dependable.  When it was slick, people fell.  And when it wasn't slick, they didn't.

Q    But on -- on that day, you believed it was dependable?

A    Yes.

Q    And the spot where you fell, I believe you described it as innocuous?

A    Yes.  It was camouflaged as just a dirty board -- set of boards, dirty area on the boardwalk.  And -- but as soon as I hit it, it zoop (phonetic).

MR. NELSON:  Did you get zoop?

(Whereupon, discussion was held off the record.)

Q    After you fell, do you recall going

A    Yes.

Q    You testified that because of that, you made a point to check the boardwalk when -- prior to walking on it to make sure or to determine whether or not it was -- it wasn't too slippery to walk on; is that correct?

A    I would say that I wouldn't walk on it if it was slippery.  That's a little more concise, if that answers your question.

Q    It does.

A    Okay.

Q    And you testified that on September 9, 2012 that you tested out the boardwalk and believed it wasn't too slippery to walk on?

A    I wouldn't say I tested it out, but I walked on it, and it was fine.

Q    Why then do you believe that the Maryland Renaissance Festival should have known or been aware of the area on which you believe you fell?

A    Well, I think that the -- the

maintenance of the walkway was their responsibility.  In that responsibility would be proper repair and maintenance, whatever that would involve.  And I think that they allowed at least that accumulation, and no one did anything about it.

Q    And -- and just so we're clear, that accumulation is the area that you believe you slipped on?

A    Yes.

Q    Do you know when that accumulation accumulated?

A    No.

Q    Do you know if Maryland Renaissance Festival was aware that that accumulation had accumulated?

A    I -- I don't know if they would know or not.

MR. NELSON:  Can you mark this one, please?

(Whereupon, Jaeger Deposition Exhibit

A    Six thousand six hundred and eighty-eight.

Q    And is it in parentheses or not?

A    Yes.

Q    Is it in parentheses?

A    Yes.

Q    Yes.

All right.  On -- that's all for that exhibit.

Mr. Jaeger on Defendant's Exhibit 3, which is the photograph, you circled an area that indicates to some -- in some way where you think you fell.

The question is this:  Had you walked across that exact area on the way to the privies before you fell?

A    Probably not.  I didn't -- not in that exact area, or I would have fallen on the way to the privies.

Q    All right.  But --

A    But I probably came out of my booth and