IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

EUGENE G. JAEGER,                        :

  Plaintiff                             :   CIVIL NO.:

 vs.                                     :   15-CV-02632 RDB

INTERNATIONAL RENAISSANCE       :
FESTIVALS, LTD., dba MARYLAND
RENAISSANCE FESTIVAL,
  Defendant.                             :   August 23, 2016

- - - - - - - - - - - - - - - - - -

        The deposition of EUGENE GEORGE JAEGER,

taken on Tuesday, August 23, 2016, commencing at

9:56 a.m., at 100 South Charles Street, Suite

1401, Baltimore, Maryland 21201, before Shannon M.

Wright, a Notary Public.

- - - - - - - - - - - - - - - - - -

Reported by:
  Shannon M. Wright

EXHIBIT A

APPEARANCES:

  On behalf of Plaintiff

        JOHN P. COLE, ESQUIRE
        The Law Office of John P. Cole, LLC
        401 Cherry Street, Suite 610
        P.O. Box 1801
        Macon, Georgia 31202
        Ph (478) 238-4716
        johnpcole01@bellsouth.net


On behalf of Defendant

        JONATHAN D. NELSON, ESQUIRE
        Ferguson, Schetelich & Ballew, P.A.
        100 South Charles Street, Suite 1401
        Baltimore, Maryland 21201
        Ph (410) 837-2200
        jnelson@fsb-law.com

(Whereupon, Jaeger Deposition Exhibit No. 1, marked.)

Q    Mr. Jaeger, I'm going to hand you this blue pen.  Would you -- you made some descriptions about different booths and areas.

Would you mind labeling them with me with the blue pen?

A    Okay.

Q    And let's -- I'm not sure how much turnover there was, but let's focus on 2012 to the best of your recollection.

A    Okay.

Q    You finished?

A    Yes.

Q    Okay.  And I believe you described before this rectangle at the bottom of the page as a boardwalk.  Am I correct?

A    Yes.

Q    Is that the boardwalk where you fell?

A    Yes.  I -- yes, exactly.

Q    Would you just mark that as the

opened at 10 a.m. like normal for the festival, right?

A    Yes.

Q    And you don't recall any particular issues or incidents?

A    Right, no.

Q    Once -- once you opened up on -- at 10 a.m. on September 9th, walk me through your morning.

A    Well, okay.  So the cannon goes off at ten.  It takes people a while to get to our booth because we're on the opposite side of the fair from the entrance.  So somewhere between 10:15 and 10:20, people start showing up.

Meanwhile, between ten and 10:20, people usually -- the artists would talk to each other.  Sometimes they would leave their booth and go into another person's booth.  And he would stand out there and sort of wait for somebody to walk by so that we would start playing.  His job mainly was to demonstrate the

sound of the instrument as people walked by and then engage with them and answer questions. I would usually be behind the booth sort of maybe arranging the -- behind the tables arranging the office, the receipts, and the change box. And make sure the bows were clean. And we would do -- on a typical day, we would do those kind of things waiting for the crowds. People -- some people would come straight from the gate to our booth for a specific reason. And some time between -- some time around 11:00, we expected the crowd to be heavier. Heavy enough to keep us both busy talking to people. So it's casual. And with individuals in small groups filtering by until around 11.

At some point, I would go to the privies and get ready for the workday, and that's what I did on that day. So I went to the privies about 10:30 -- between 10:30 and 10:40. I walked to the far privies and walked back.

Q    So you would go prepare for the workday

after the festival had opened?

A    Some preparations were done afterwards. The -- well, the crowd -- some people would come straight to the booth, but usually you had ten or 15 minutes before anybody would get there. And the crowd didn't start to be heavy enough to where it took two people to engage customers till 11, maybe a little after 11 depending on the day.  So yes.

Q    Prior to going to the privies, I think you said between 10:30 and 10:45 --

A    Yes.

Q    -- on September 9th, did you -- were you outside your booth at all on the 9th from the time you woke up until the time you went to the privies?

A    Well, my booth is open, so I was outside if I was in the booth.  I had a small closed area in the back, but, essentially, it was open, and that's where I would be.  The farthest I would get out would be to sweep the

Deposition of Eugene G. Jaeger          Eugene G. Jaeger v. International Renaissance Festivals, LTD., dba Maryland Rena

A   Yes.   I don't remember any leaves, and I remember the boardwalk being clean and dry.

Q   Why do you believe that you fell on September 9, 2012?

A   I believe I fell because I stepped onto a patch of something very slippery.

Q   Do you know what that very slippery patch was?

A   Well, not specifically, but it was some kind of mud.  I know that.  And it seemed to have a consistency of clay and be the color of just some dirt.

Q   Well, how do you know that?

A   How do I know the consistency?

Q   Well, yeah.  And -- and you just said you don't really know what it is, but --

A   I don't know what it was, but I know how it felt.

Q   What do you mean?

A   It felt slippery.  Oh.

Q   I'm sorry.

around while I had caught myself with my hands. So they had hit the ground with whatever was there.

And, like I said, my concern was the injuries and not the dirt.  I had a slight twinge of concern for the costume because it wasn't wearable after that, but then I quickly realized I didn't really need a costume now anyway.

So that's why I was muddy.

Q    I understand.

And -- and I guess I'm -- what I don't understand is you say you slipped.  Understood.

And that you believe it was on a clay or mud substance because you had clay or mud on other parts of your body when you fell?

A    On the seat of my pants.

Q    But you fell straight down?  Is that what you testified?

A    Yes.

Q    And when you walked originally from

CRC Salomon, Inc.
Office (410) 821-4888

www.crcsalomon.com - info@crcsalomon.com
2201 Old Court Road, Baltimore, MD 21208

Page: 115
Facsimile (410) 821-4889

your booth to the privies and you're walking

along the boardwalk, did you make any

observations about the condition of the

boardwalk at that time?

A    I remember the boardwalk being

beautiful, clear.  Not dangerous or suspicious

at all.  I had seen it slippery.  It was not

slippery.  It was clean.

Q    And then when you were walking back

from the privies to your booth up until the time

you fell, what, if any, observations did you

make about the boardwalk -- the condition of the

boardwalk?

A    The observations would have been

peripheral, but I -- there was no problem with

the boardwalk.

Q    So your testimony is that you observed

no problem with the boardwalk either going to

the privies from your booth or returning to your

booth from the privies, but in the area where

you slipped, there was sufficient mud or clay to

walked on the gravel.  You could tell right away when you stepped on it if it was slick, and I'd seen enough people fall that I wouldn't walk on it -- excuse me -- if it was slick.  But that day, it was one of the days that it was dependable.  I have to say it was usually dependable.  When it was slick, people fell.  And when it wasn't slick, they didn't.

Q    But on -- on that day, you believed it was dependable?

A    Yes.

Q    And the spot where you fell, I believe you described it as innocuous?

A    Yes.  It was camouflaged as just a dirty board -- set of boards, dirty area on the boardwalk.  And -- but as soon as I hit it, it zoop (phonetic).

MR. NELSON:  Did you get zoop?

(Whereupon, discussion was held off the record.)

Q    After you fell, do you recall going

Deposition of Eugene G. Jaeger    Eugene G. Jaeger v. International Renaissance Festivals, LTD., dba Maryland Rena

maintenance of the walkway was their responsibility. In that responsibility would be proper repair and maintenance, whatever that would involve. And I think that they allowed at least that accumulation, and no one did anything about it.

Q    And -- and just so we're clear, that accumulation is the area that you believe you slipped on?

A    Yes.

Q    Do you know when that accumulation accumulated?

A    No.

Q    Do you know if Maryland Renaissance Festival was aware that that accumulation had accumulated?

A    I -- I don't know if they would know or not.

MR. NELSON:    Can you mark this one, please?

(Whereupon, Jaeger Deposition Exhibit